***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Chief Deputy Commissioner Gheen and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Chief Deputy Commissioner Gheen with minor modifications.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The plaintiff-employee was employed by defendant-employer, Norandal USA, Inc., from August 1, 1976 until December 1, 2004.
2. Global Indemnity, Royal and SunAlliance, Argonant Insurance Company, Argonant Midwest Insurance Company, National Union and Cigna/ACE USA/ESIS provided workers' compensation coverage during the plaintiff-employee's employment with the defendant-employers. For purposes of this claim, Cigna/ACE USA/ESIS shall be responsible for any workers' compensation benefits awarded to the plaintiff-employee as a result of his employment with the defendant-employer.
3. The parties are subject to the North Carolina Workers' Compensation Act, the defendant-employers employing the requisite number of employees to be bound under the provisions of said Act.
4. In addition, the parties stipulated into evidence the following:
 a. The Pre-Trial Agreement dated May 1, 2006.
 b. One volume of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 261514.
 c. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 078061. *Page 3 
 d. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 014133.
 e. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 226564.
 f. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 226563.
 g. Three volumes of documents, which included the transcript of proceedings in Daywalt v. Norandal USA and the stipulated exhibits from that case.
 h. Three volumes of documents, consisting of corporate records and an asbestos survey in IC 041133.
 i. Additional medical records relating to IC 226563.
 j. Additional medical records relating to IC 078061.
 k. Additional medical records relating to IC 226564
 l. Additional medical records relating to IC 014133
 m. Additional medical records relating to IC 261514.
5. The Pre-Trial Agreement dated May 1, 2006, which was submitted by the parties, is incorporated by reference.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following: *Page 4 
 FINDINGS OF FACT
1. Decedent, who was born December 4, 1937, began working for defendant-employer's predecessor in October 1966. The plant in Salisbury where he worked produced aluminum foil of various thicknesses and widths, according to the specifications of its customers. Republic Foil built the facility in approximately 1965. The original plant had two foil separators, two slitters, one coil annealing furnace and six foil annealing furnaces. In subsequent years, one additional separator and another coil annealing furnace were added to the original building.
2. The plant was later purchased by National Aluminum, which expanded the facility in 1979 and 1980 to add a new building to which the casting operations were moved. During the expansion and the next six years, further equipment was added. By 1986 plant production was over 90 million pounds. Production increased further after another coil annealer was added. Norandal USA, Inc. then bought the facility in approximately 1989.
3. The process used by the plant involved melting raw aluminum, casting it into sheets, rolling sheets in mills until it achieved the desired thickness, cutting, or slitting the foil to the specified width and then winding it onto a core either as double or single sheets. In addition, the coils were heated to high temperatures in annealing furnaces at certain stages of the process in order to make the aluminum more flexible and strong and in order to remove oils and other residues.
4. When the original annealing furnaces were built, insulation containing asbestos was used in the walls, ceilings and floors. The wall insulation was sandwiched between an outer steel wall and an inner steel plate. When the furnaces were new, there was no asbestos insulation exposed along the walls and ceilings. *Page 5 
5. In a separate room within the original plant, employees machined sheets of Maranite, which looked like sheet rock but was much harder. The Maranite was used to make "tips" for the casting process. During the 1960s and 1970s, Maranite contained twenty-five to fifty percent asbestos. The employees in the Maranite shop drilled, sawed and sanded the Maranite sheets to achieve the desired shape for the tips. After the expansion in 1980, the process was moved to the new casting building. However, it appeared that the Maranite manufacturer stopped making the product in 1978, so it was not clear how much longer the plant continued to use asbestos-containing Maranite to make tips. After the asbestos-containing Maranite was no longer available, the plant began using a ceramic material.
6. In 1972 plant management asked the State Board of Health to conduct an industrial hygiene survey of the Maranite shop. An industrial hygienist performed the survey and prepared a report in which he noted that the woodworking machines in the shop were equipped with hoods connected to an exhaust ventilation system, but that there was no means of dust control for hand-sanding. Air sampling conducted on employees working in the Maranite shop revealed levels of asbestos significantly above the permitted exposure limit, which at that time was well above the exposure limits later specified by OSHA. Consequently, the plant was advised to increase the volume of air drawn into the exhaust system.
7. In 1973 Z. L. Brown prepared a memorandum explaining to plant management how the OSHA standards for asbestos exposure were going to change and what procedures would be necessary for compliance. Some of the procedures he described were later implemented, but the vacuum system was not upgraded.
8. Subsequent industrial hygiene surveys did not result in any asbestos-related OSHA violations. However, in a report filed in 1985, insulation was noted to have fallen from the walls *Page 6 
of the annealing furnaces by NIOSH investigators. Testing revealed that the insulation contained five to eight percent asbestos. An industrial hygienist performed air sampling of the furnace crew and reported acceptable levels of asbestos exposure but noted that there was no recommended limit for exposure to bulk material and loose insulation containing asbestos. He expressed concern about the deteriorating insulation that was falling out of the furnaces, not only for the furnace crew but for other employees, as well, because convective air currents could carry asbestos fibers into the plant. He recommended a regular maintenance program for the furnaces as well as a monitoring program and advised the company to take corrective action by either sealing or removing the deteriorating insulation.
9. The industrial hygienist also noted that no clean-up activities were performed during his monitoring process and that it was more likely that employees would be exposed to short term high levels of asbestos rather than elevated full shift exposures. On the other hand, despite employee reports of seeing material being carried out of the furnaces on air currents, he did not observe that occurring.
10. Some air sampling was conducted in January 1987 during a cleaning process when scrap foil was being removed from one of the annealing furnaces. Although the sampling was not conducted for a long enough period to determine a proper time weighted average exposure, it showed the employee was exposed to 2.8 fibers per cubic centimeter of air during the time involved. Consequently, F. N. Bassinger suggested that protective clothing and respirators be provided to the employees performing that task until the problem was corrected. Despite that recommendation, the plant did not require employees to use protective clothing or respirators.
11. Further air sampling was conducted in November 1987 after regular cleaning of one of the furnaces and it revealed asbestos levels of 2.1 fibers per milliliter of air. This sampling *Page 7 
was also conducted for too short of a period to derive a proper time weighted average exposure. Elevated asbestos levels were also subsequently revealed by air sampling at one of the furnaces in 1990. The company then began the process of removing and replacing the insulation in the older annealing furnaces. It hired companies that specialized in asbestos abatement to perform the work, but the plant only had one furnace modified at a time because of the expense and the loss of productivity involved. The area was tented during the abatement process.
12. Laboratory testing of the insulation when the first furnace was abated in July or August 1990 revealed that there was block insulation containing fifteen to thirty percent asbestos and duct insulation containing thirty-five to fifty-five percent asbestos in the annealing furnace.
13. During the years of the abatement activities, there were several memoranda to plant management noting that the insulation in the annealing furnaces had deteriorated, that loose pieces were sometimes falling out and that there were loose protection panels in the walls and doors to the furnaces. The abatement process was completed in approximately 1998.
14. In about 1978 an explosion occurred in annealing furnace No. 21 which caused the door of the furnace, which weighed several tons, to fly forty to sixty feet into the plant, and which sent dust and debris throughout the plant. It took at least one month to clean up after the explosion.
15. Throughout the periods in question, the plant was ventilated by large overhead exhaust fans. There were also fans inside of the furnaces which distributed the heat. The heat and air movement inside the furnaces were part of the reason that insulation in the walls and doors would deteriorate and break off. The plant used a vacuum system to remove and capture scrap pieces of aluminum so that the aluminum scrap could be reprocessed. The vacuum system drew in dust and debris from the machines as well as the scrap aluminum. The aluminum pieces as well *Page 8 
as the dust and debris would go through a "cyclone" which separated the aluminum scraps, but the rest of the dust went through a wire mesh and exited inside the plant, not outside. Employees also used compressed air to clean their machines. Consequently, there were multiple ways that dust containing asbestos fibers would spread within the plant.
16. When he was hired, decedent was assigned to work in the rolling mill department, where he worked as a scrap handler and as a mill helper until he became a mill operator in March 1967. He worked as a mill operator until 1978 and then took a different position as a utility worker for the separators in the finishing department. In July 1980 he became a furnace operator in the casting department, but he went back to the utility position two months later. He returned to the casting department in January 1981 and worked as a furnace operator there until July 1984 when he transferred to a position as a roll grinder.
17. By the early 1990s decedent was having attendance problems. He was written up multiple times, was suspended without pay and was put on probation on more than one occasion. When he did not appear for a disciplinary hearing scheduled to address his attendance problems, his employment with the company was terminated effective June 23, 1992.
18. After his termination by defendant-employer, decedent worked for a number of security firms as well as for a retirement center and a school.
19. During the time decedent worked in the rolling mill department, his workstation was either close to the Maranite shop or to the electrical room, depending upon where the machine he was assigned to was located. He was occasionally seen in the Maranite shop but would not have actually had to work there. Apparently it was a cooler area than other parts of the plant and employees would sometimes go into the room in order to cool down some. They usually went there during second and third shifts when no one would be working in the Maranite *Page 9 
shop. However, someone also had to be monitoring the rolling mills, so the employees could not be away from their workstations for long.
20. When decedent transferred to the casting house in 1980, the department would have been located in the new building. Consequently, it did not appear that he would have been exposed to much asbestos-containing dust in his job there. The hazards of asbestos exposure were known by the time the new building was constructed. There was no independent evidence of asbestos-containing material used in the new building. Although the employees who testified at the hearing before the Deputy Commissioner thought that they could identify asbestos-containing material by sight, the industrial hygienists who testified and who had much more experience identifying asbestos-containing material made it clear that, with only a few exceptions, it looked the same as asbestos-free material and had to be identified by laboratory testing. Consequently, the testimony of the employees regarding which material contained asbestos was not accepted as factual when their opinions were based solely upon the appearance of the material.
21. On a few occasions while assigned to the cast house, decedent was observed working in the tip shop, which was where the tips were made after the plant expansion when the Maranite shop in the original building was converted to other uses. However, since Johns Manfield had stopped manufacturing Maranite in 1978, it was not clear whether the boards being cut and sanded in the tip shop contained asbestos or whether they were made of the new ceramic material.
22. The roll-grinding department where decedent last worked was apparently located in the rolling mill area of the original building. However, this area was separated from the annealing furnaces by the slitter/separator department. It did not appear that decedent was working in close proximity to the sources of asbestos dust while working as a roll grinder. In *Page 10 
fact, he did not appear to have had nearly as extensive an exposure to asbestos dust in his positions with the company as the employees who regularly worked with the annealing furnaces.
23. No medical records for the periods before 1999 were submitted into evidence for decedent. On December 3, 1999 he was treated at Cooleemee Family Practice for an upper respiratory tract infection and was noted to weigh 314 pounds at that time. In March 2000 Dr. Zastrow noted that he had gained 20 pounds and that he had diabetes. Decedent was followed at that clinic until the end of that year and then began going to the VA hospital for medical care. Notes from that facility indicated that his diabetes was generally poorly controlled.
24. Decedent had chest x-rays taken in January 2001 which his attorney sent to a Dr. Lucas of Jackson, Mississippi. Dr. Lucas reported irregular interstitial opacities in the mid and lower lungs with a profusion of 1/0, but there were no pleural changes demonstrated. Dr. Johnson subsequently read the films and also found interstitial opacities with a profusion of 1/1.
25. On October 27, 2001 decedent was evaluated by Dr. Schwartz, a pulmonologist at Duke Medical Center. Decedent reported that he had not worked directly with asbestos-containing material but others working around him had occasionally used asbestos insulation. He apparently had smoked heavily from 1950 to 1996 when he quit smoking altogether. He indicated that he had developed progressive shortness of breath over the past several years and would get short of breath after climbing one flight of steps. In addition, he had a productive cough. Pulmonary function testing revealed mildly reduced lung volumes but elevated residual volumes. After reviewing the chest x-rays, Dr. Schwartz was of the opinion that decedent had evidence of interstitial lung disease, with a profusion of 1/1, and considering his history of asbestos exposure, he probably had asbestosis. *Page 11 
26. Decedent then filed this workers' compensation claim. Defendants sent his films to Dr. Goodman, a radiologist at Duke Medical Center. He found decedent's films to be underexposed and contrasty, with linear artifacts over part of the left lung. There appeared to be possible peripheral linear opacities within the lung parenchyma, but given the film quality issues, the markings could have been due to artifact. He recommended that decedent undergo a CT scan to clearly identify any fibrosis. However, despite the quality issue with the films, the doctor was able to determine that there was no evidence of asbestos-related pleural disease.
27. The same x-rays were also read by Dr. Alexander, who saw no interstitial abnormalities and no pleural thickening or calcification. He did not find any evidence of asbestosis-related disease.
28. On October 24, 2003 decedent had a preoperative chest x-ray taken at the Veterans Administration Hospital which appeared to show a mass in the pleural space. These findings had not been shown by his x-rays from January 2001.
29. On November 8, 2003 decedent's daughter found him unresponsive at his home and called the rescue squad. When he arrived at the hospital, his blood sugar level was 52 and he was paralyzed. His family indicated that he had been sick with the flu for about a week. Dr. Agner admitted him to the intensive care unit of the hospital with initial impressions of respiratory failure, probably due primarily to pneumonia but with a possible element of heart failure, probable chronic lung disease due to his smoking history and a recent gastrointestinal bleed.
30. Decedent did not regain consciousness in the hospital. A chest x-ray performed there revealed the lesion at his left lung that had been discovered at the Veterans Administration Hospital several weeks earlier. On November 10, 2003 Dr. Hill, a neurologist, evaluated him. The doctor performed an EEG which revealed evidence of a severe, diffuse encephalopathy, *Page 12 
probably due to hypoxemia. In his opinion, decedent's prognosis for significant functional recovery were quite poor.
31. In view of decedent's severe brain damage, he was taken off of life support and he died on November 11, 2003. His final diagnoses included respiratory failure secondary to pneumonia and congestive heart failure, severe brain damage due to lack of oxygen, chronic renal failure due to diabetes, hypertension, and chronic lung disease, a mass in his left upper lung thought to becancerous and ischemic heart disease with a probable small myocardial infarction.
32. The family requested an autopsy of decedent's lungs, which was performed by Dr. Weber. Dr. Weber found that the mass was actually in the chest wall, not in the lung itself. It had eaten away part of a rib. Pathological examination showed that the mass was, in fact, malignant. However, it probably did not contribute to decedent's death. The autopsy also revealed evidence of resolving pneumonia, a small blood clot, changes due to emphysema, anthracosis in two lymph nodes and no ferruginous bodies. There was no indication of interstitial fibrosis.
33. Dr. Johnson indicated that the autopsy findings were inconsistent with his reading of the x-ray but stated that the autopsy would be the gold standard for determining what was actually in decedent's lungs.
34. Despite the x-ray appearance of interstitial abnormalities, at least to some of the reviewing doctors, decedent actually had no interstitial fibrosis in his lungs. The autopsy provided the most reliable information concerning what was in his lungs and it revealed that he did not have asbestosis or any other asbestos-related lung disease.
35. As of the date of his death, decedent had not developed asbestosis. Plaintiff also did not prove that decedent otherwise developed an occupational disease which was due to causes *Page 13 
and conditions characteristic of his employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. As of the date of his death, decedent had not developed asbestosis, the characteristic fibrotic condition of the lungs caused by inhalation of asbestos dust. N.C. Gen. Stat. §§ 97-53(24) 97-62.
2. Plaintiff has also not proven that decedent developed an occupational disease of the pleura which was due to causes and conditions characteristic of and peculiar to his employment and which excluded all ordinary diseases of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53(13);Booker v. Duke Medical Center, 297 N.C. 458 (1979).
3. Because the Plaintiff has not proven that decedent developed an occupational disease of the pleura, it is unnecessary to address Plaintiff's contentions that any Award be subject to a ten percent increase for OSHA violations as the issue is moot. 4. The Industrial Commission may tax costs. N.C. Gen. Stat. § 97-74.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. This claim must, under the law, be and it is hereby DENIED. *Page 14 
2. Each side shall pay its own costs.
This __ day of November 2008.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BUCK LATTIMORE COMMISSIONER
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1